**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

DAPHNE RICHARD, individually, and on behalf of others
similarly situated,

                                Plaintiff,

v.

GLENS FALLS NATIONAL BANK and DOES 1 through
100,

                                Defendants.

1:20-cv-00734 (BKS/DJS)

---

**Appearances:**

*For Plaintiff:*
John C. Cherundolo
J. Patrick Lannon
Cherundolo Law Firm, PLLC
AXA Tower One 17th Floor
100 Madison Street
Syracuse, NY 13202

Kevin P. Roddy
Wilentz Goldman & Spitzer PA
90 Woodbridge Center Drive, Suite 900
Woodbridge, NJ 07095

Taras Kick
The Kick Law Firm
815 Moraga Drive
Los Angeles, CA 90049

*For Defendant Glens Falls National Bank:*
Lukasz Sosnicki
Thompson Coburn LLP
2029 Century Park East, 19th Floor
Los Angeles, CA 90067

Jonathan B. Fellows
Bond Schoeneck & King, PLLC
One Lincoln Center
Syracuse, NY 13202

Hon. Brenda K. Sannes, United States District Judge:

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiff Daphne Richard brings this putative class action against Defendant Glen Falls

National Bank and various Doe Defendants[1] asserting claims for breach of contract, breach of

the implied covenant of good faith and fair dealing, unjust enrichment/restitution, money had and

received, and violations of New York General Business Law ("NYGBL") § 349 arising out of

Defendant's practices with respect to overdraft fees ("Overdraft Fees") and non-sufficient funds

fees ("NSF Fees"). (Dkt. No. 1). Presently before the Court is Defendant's motion to: (1) dismiss

Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and (2) strike certain of the

Complaint's allegations pursuant to Fed. R. Civ. P. 12(f) (collectively, the "Motion"). (Dkt. No.

15). Plaintiff has filed an opposition to the Motion, (Dkt. No. 16), together with a request for

judicial notice of certain documents, (Dkt. No. 17), and Defendant has replied, (Dkt. No. 18). For

the reasons that follow, the Motion is granted in part and denied in part.

## II.    SUBJECT MATTER JURISDICTION

Before turning to the merits of Plaintiff's claim, the Court addresses the question of

whether it has subject matter jurisdiction over this action. *See Durant, Nichols, Houston,*

*Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) ("'It is a fundamental

precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such

limits as have been imposed by the Constitution or Congress . . . If subject matter jurisdiction is

lacking and no party has called the matter to the court's attention, the court has the duty to

---

[1] Plaintiff's Complaint describes the Doe Defendants as "agents, partners, joint ventures, subsidiaries and/or affiliates of Glens Falls" that, "upon information and belief, also own and/or operate Glens Falls branch locations." (Dkt. No. 1, at ¶ 6). As Defendant Glens Falls National Bank is currently the only named Defendant in this action, for purposes of this decision, the Court uses the term "Defendant" to refer to Defendant Glens Falls National Bank.

dismiss the action sua sponte." (citations omitted)). In the Complaint, Plaintiff asserts that the

Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). (Dkt. No. 1, ¶ 12).[2]

Section 1332(d) grants federal courts jurisdiction over class actions that involve: "(1) 100

or more class members, (2) an aggregate amount in controversy of at least $5,000,000, exclusive

of interest and costs, and (3) minimal diversity, *i.e.,* where at least one plaintiff and one

defendant are citizens of different states." *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 56 (2d Cir.

2006) (citing 28 U.S.C. § 1332(d)(2), (5)(b), (6)). "The Second Circuit has held that the

traditional rule that the party asserting federal court jurisdiction bears the burden of establishing

that the case is properly in federal court still applies when the party is asserting such jurisdiction

under [28 U.S.C. § 1332(d)]." *Anirudh v. CitiMortgage, Inc.*, 598 F. Supp. 2d 448, 450-51

(S.D.N.Y. 2009) (citing *DiTolla v. Doral Dental IPA of N.Y., LLC*, 469 F.3d 271, 275 (2d Cir.

2006)).

On January 20, 2021, this Court issued an Order to Show Cause in which it found that

"[t]he Complaint's allegations are insufficient to show that either the minimal diversity or

amount-in-controversy requirements of 28 U.S.C. § 1332(d) are met" in this action because it

appeared that "both Plaintiff and Defendant Glens Falls National Bank are citizens of New

York," and there were no allegations that any member of a proposed class is a citizen of a state

other than New York. (Dkt. No. 23, at 4). The Court ordered Plaintiff to file a memorandum

"showing cause why this action should not be dismissed for lack of subject

matter jurisdiction." (*Id*.). In her responsive filing, (Dkt. No. 24), Plaintiff seeks leave to amend

her complaint to add the following allegation:

---

[2] Plaintiff also cited 28 U.S.C. § 1331 as a basis for subject matter jurisdiction, but the complaint only presents state law causes of action.

> This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) & (6), this Court has jurisdiction because (a) the proposed Class is comprised of at least 100 members; (b) at least one member of the proposed Class resides outside of the State of New York; and (3) the aggregate claims of the members of the proposed Class exceed $5 million, exclusive of interest and costs.

(Dkt. No. 24-2, at 3). In support of this allegation, Plaintiff submits, inter alia, a declaration from her attorney[3] stating that he spoke with defense counsel who informed him that Defendant's customers include those with citizenship outside of New York, and that the Defendant did not intend to challenge this Court's jurisdiction over this matter. (Dkt. No. 24-1, at 2). Plaintiff's counsel also explained that, following his review of a Form 10K for the holding company for Defendant Glen Falls National Bank, and given his experience in other consumer class actions related to alleged improper Overdraft and NSF fees, he believes that "the amount in controversy in this action exceeds $5 million." (*Id.*). In its response to Plaintiff's filing, Defendant does not contest the new proposed allegations in paragraph 12 of the proposed amended complaint for the purposes of the Order to Show Cause and whether the proposed amended complaint sufficiently pleads subject matter jurisdiction. (Dkt. No. 25, at 1).

Considering Plaintiff's submission in response to the Order to Show Cause, the Court finds that, for purposes of the pleading stage, Plaintiff has met the minimal diversity requirement of 28 U.S.C. § 1332(d), i.e. that there is at least one class member who is a citizen of a State other than New York and was subjected to the alleged improper Overdraft or NSF Fees. Furthermore, at the pleading stage, Plaintiff's uncontested allegation that the aggregate amount in controversy exceeds $5,000,000 is sufficient to meet 28 U.S.C. § 1332(d)'s amount in controversy requirement. *See Doe v. Trump Corp.*, 385 F. Supp. 3d 265, 283 (S.D.N.Y. 2019)

---

[3] The Court may consider evidence outside the complaint in determining whether it has subject matter jurisdiction over this action. *See, e.g., Cameron v. LR Credit 22, LLC*, 998 F. Supp. 2d 293, 297 n.3 (S.D.N.Y. 2014).

(explaining for purposes of subject matter jurisdiction under 28 U.S.C. § 1332(d), "there is 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'" (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006))). Finally, the amended complaint's allegations give rise to a plausible inference that Plaintiff's proposed classes comprise at least 100 members. (Dkt. No. 24-2, at ¶ 65 ("While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believe[s] that the Classes are likely to include thousands of members based on the fact that Glens Falls has approximately $2.5 billion in assets and operates approximately 30 branches in New York.")).

Therefore, the Court finds that it has subject matter jurisdiction over this action, and proceeds to evaluate Defendant's pending Motion on its merits. The Court will evaluate Defendant's Motion in light of Plaintiff's proposed amended complaint, (Dkt. No. 24-2), which is identical to her original complaint aside from the new subject-matter-jurisdiction-related allegation described above, and which the Court will hereinafter refer to as the "Complaint." *See Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303-04 (2d Cir. 2020) ("[W]hen a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint.").

## III.   FACTS[4]

Plaintiff is a resident of Glens Falls, New York and was a member of Defendant during all time periods relevant to the Complaint. (Dkt. No. 24-2, at ¶ 4). Defendant offers consumer

---

[4] The facts are drawn from Plaintiff's Complaint, (Dkt. No. 24-2), as well as documents incorporated by reference in or integral to the Complaint and documents of which the Court may take judicial notice. *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 781 n.1 (2d Cir. 2019) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422, 429 (2d Cir. 2011)).

banking customers such as Plaintiff a checking account, which comes with features such as a debit card and the ability to write checks, withdraw money from ATMs, schedule Automated Clearing House ("ACH") transactions, and conduct other types of debit transactions. (*Id.* ¶ 14). When Defendant determines that a customer's account does not have sufficient funds to complete a particular debit transaction, Defendant may assess one of two types of fees: an Overdraft Fee, which occurs when Defendant authorizes and pays the transaction despite the insufficient funds, or an NSF fee, which occurs when Defendant rejects and does not pay the transaction. (*Id.* ¶ 15; Dkt. No. 15-3, at 4 ("Insufficient Funds" section describing these options); Dkt. No. 17-11 (fee schedule listing Overdraft and NSF Fees); Dkt. No. 16, at 17 n.4).

There are three types of "balances" for a customer's checking account: the "balance," the "collected available balance," and the "artificial available balance." (Dkt. No. 24-2, at ¶ 23).[5] The "balance," sometimes called the "actual balance" or "ledger" balance, reflects the money actually in the customer's account, without deductions for holds on pending transactions or on deposits. (*Id.*). The "balance" is the official balance of the account that is used for reporting, regulatory and credit rating purposes. (*Id.*). The "collected available balance" is the "balance" less holds placed on certain deposits pursuant to Defendant's "Funds Availability Policy." (*Id.* ¶ 24). The "artificial available balance" is the "collected available balance" less pending debit card transactions which have not yet posted (meaning that the money charged for the transaction is still in the customer's account). (*Id.* ¶ 25). Plaintiff alleges that Defendant uses the "artificial

---

The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[5] In its briefing, Defendant refers to only two types of balances—the "ledger" balance and the "available" balance—rather than the three described in Plaintiff's Complaint. For purposes of the pending Motion, where the Court must accept the well-pled facts in Plaintiff's Complaint as true, the Court uses Plaintiff's framework.

available balance" to determine whether an account has sufficient funds to complete a transaction, and thus whether to charge an Overdraft or NSF Fee. (*Id.* ¶ 26).

The policies applicable to Plaintiff's checking account, and those of other consumer customers, are found in a Deposit Account Agreement (the "Account Agreement") and an accompanying schedule of fees (the "Fee Schedule").[6] The Account Agreement includes a section titled "Insufficient Funds," which reads, in its entirety:

> You must maintain a balance in your Account that will cover the checks you write and any other debits or similar transactions (in-person withdrawals, ATM withdrawals or other electronic transactions) initiated by you, and other fees or charges applied to your Accounts, and you must promptly deposit funds to cure a negative balance in any of your Accounts. If you write a check or initiate other debits or similar transactions for more money than you have in your Account, we have the option to either pay the check or other debit or other similar transaction or return it unpaid. The Bank may determine whether your Account contains sufficient funds to pay a check, other debit or similar transaction at any time between the time the check or other debit or similar transaction is received by the Bank and the Bank's return deadline, and only one determination of the Account balance is required. If that determination reveals insufficient funds to pay the check or other debit or similar transactions, the Bank will not be required to honor the check or other debit or similar transactions. Alternatively, the Bank may honor the check or other item and create an overdraft. The honoring of one or more overdrafts, however, does not obligate the Bank to honor any future overdrafts, and you should not rely on the Bank to honor an overdraft. The Bank is not required to send you prior notice on checks or other debits or similar transactions returned for insufficient funds. We will impose a handling charge for each check or other debits or similar transactions presented against insufficient funds, whether or not we pay the check or other debits or similar transactions. Additionally, you agree to reimburse the Bank for any costs it incurs in collecting the overdraft from you including, without limitation, reasonable attorney's fees and the costs of litigation, to the full extent permitted by applicable law. If for any reason, a check you have deposited is returned for insufficient or uncollected funds, the Bank reserves the right to send it for collection through electronic means. In addition, if we receive an item for collection transmitted by electronic means from a depository bank, you have a right to request a copy from us. We do not charge fees for overdrafts caused by ATM withdrawals or one-time Point of Sale (POS)/Debit Card transactions.

---

[6] Plaintiff did not attach copies of the Account Agreement or the Fee Schedule to her Complaint, but Defendant submitted copies of the Account Agreement in connection with its Motion, (Dkt. Nos. 15-2, 15-3), and Plaintiff submitted a copy of, and requested judicial notice of, the Fee Schedule in connection with her opposition, (Dkt. No. 17-11). Because these documents are incorporated by reference in and integral to the Complaint, the Court may consider them in ruling on the Motion. *Velarde*, 914 F.3d at 781 n.1.

(Dkt. No. 15-3, at 4). In a separate section titled "Statement Balance," the Account Agreement provides that the "statement balance" "reflects the balance in your Account regardless of when we receive credit for noncash items deposited by you as defined under our Funds Availability Policy" (discussed further below). (*Id.* at 5). The Account Agreement also includes a section titled "Subaccounts," which explains that checking accounts consist of a "master account" and two subaccounts—a "savings account" and a "transaction account"—and that the "combined balances of both subaccounts will be used for the master Account balance for determining whether . . . transaction fees apply." (*Id.* at 6).

The Account Agreement also includes a section titled "Funds Availability Disclosure," which explains Defendant's Funds Availability Policy. In relevant part, the section reads:

> Our general policy is to delay the availability of funds that you deposit in your Account. Our policy is to make a portion of the funds from your deposit available to you on the business day we receive your deposit and to make the remaining funds from your deposit available at a later date. Once the funds are available, we will use them to pay checks that you have written or you may withdraw them in cash . . . If you will need the funds from a check deposit right away, you should ask us when the funds will be available. In some cases, we will not make all of the funds that you deposit by check available to you at the times shown above. Depending on the type of check that you deposit, funds may not be available until the seventh (7th) Business Day after the Day of Deposit. However, the first $200 of your deposits will be available on the Day of Deposit.

(*Id.* at 7).

Plaintiff alleges that the Account Agreement nowhere states or implies that Defendant will use an account's artificial available balance or collected available balance, as opposed to the actual or ledger balance, when determining whether to charge an Overdraft or NSF Fee. (Dkt. No. 24-2, at ¶¶ 26-31). Plaintiff contends that, to the contrary, the plain language of the "Insufficient Funds" section "expressly, or at least strongly implicitly," states that the *actual* balance will be used for such purposes. (*Id.*). Plaintiff further argues that, even if "there might be an arguable ambiguity as to whether [Defendant] was allowed to use 'collected available

balance' rather than 'balance'" for such purposes, "under no circumstances is there even an implication that it could use the 'artificial available balance,' meaning an unannounced deduction for pending debit card transactions." (*Id.* ¶ 30). Therefore, Plaintiff claims, by applying deductions for pending, unsettled debit card transactions to an account's balance when determining whether to charge an Overdraft or NSF Fee, Defendant breached the terms of the Account Agreement. (*Id.* ¶ 31).

Plaintiff also alleges that Defendant breached the Account Agreement by charging multiple NSF fees for the same transaction. Specifically, Defendant "charges a $32 fee when an electronic item is first processed for payment and [Defendant] determines that there supposedly is not enough money in the account to cover the item," and "then charges an *additional* NSF fee if the same item is presented for processing again [by a merchant or vendor], even though the account holder took no action to resubmit the transaction for payment." (*Id.* ¶ 32). Plaintiff contends that this practice violates the Account Agreement, which provides that, if the funds in the account are insufficient to cover a transaction, Defendant "may honor the check or other item and create **an** overdraft" (not "overdrafts"), and states in the Fee Schedule that a $32 fee will be charged "per item," not "per presentment of the item." (*Id.* ¶¶ 32-34, 54).

Plaintiff contends that the harm to consumers from Defendant's allegedly improper practices is compounded because each Overdraft or NSF Fee "further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which [Defendant] assesses further overdraft or NSF fees." (*Id.* ¶ 58). Plaintiff claims that this practice has been "deemed to be deceptive and substantially harmful to customers" by the Consumer Financial Protection Bureau. (*Id.*).

9

Plaintiff provides several examples of instances in which she personally suffered harm from Defendant's allegedly improper practices. For example, "[o]n December 24, 2018, when Plaintiff had $73.58 in her account, she engaged in a transaction for $51.29, leaving $22.29 in her account, but was nonetheless charged a $32 'Overdraft Fee' for it." (*Id.* ¶ 57). As another example, on December 26, 2018, Plaintiff was charged two NSF Fees for two separate declined charges, and was subsequently charged two additional NSF fees when those transactions were re-presented for payment by the merchant and declined again. (*Id.*). Similarly, on July 20, 2016, Plaintiff was charged an NSF Fee after a transaction was declined, and was charged an additional NSF Fee when the item was re-presented for payment and declined again approximately a week later. (*Id.*).[7]

On behalf of herself and a proposed class,[8] Plaintiff brings claims against Defendant for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment/restitution, money had and received, and violations of NYGBL § 349. (*Id.* ¶¶ 74-101). Defendant's Motion seeks dismissal of all five of Plaintiff's claims. (Dkt. No. 15).

---

[7] Plaintiff also alleges that she was charged "Insufficient Funds Fees" for several items purchased on July 24, 2018, but appears to acknowledge that, at the time she was charged those fees, "there were insufficient funds in the account to cover the items." (*Id.*). It is unclear whether this reflects a typographical error, and Plaintiff did not attempt to clarify the issue when discussing these allegations in her opposition briefing. (Dkt. No. 16, at 15 n. 3).

[8] Plaintiff's proposed "Class" is comprised of two sub-classes: an "Account Balance Class" and a "Repeat NSF Class." (*Id.* ¶ 62). Plaintiff's proposed "Account Balance Class" includes "[a]ll United States residents who have or have had accounts with [Defendant] who incurred an overdraft fee or NSF fee when the balance in the checking account was sufficient to cover the transaction at issue during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified." (*Id.*). Plaintiff's proposed "Repeat NSF Class" includes "[a]ll United States residents who have or have had accounts with [Defendant] who incurred an NSF fee more than once, or an NSF fee followed by an overdraft fee, for the same item during the period beginning six years preceding the filing of this Complaint and ending on the date the class is certified." (*Id.*).

IV.     **MOTION TO DISMISS**

A.     **Legal Standard**

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

B.     **Breach of Contract**

To survive a motion to dismiss a breach of contract claim under New York law,[9] the complaint must allege facts which show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S. Dist. LEXIS 112209, at *14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd.*

---

[9] The parties appear to assume that New York law applies, and the Court does as well. *See Krumme v. WestPoint Sevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (parties' assumption that New York law controls is sufficient to establish choice of law); *see also* (Dkt. No. 15-3, at 5, 10) (contract provisions providing that New York law governs).

*v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)). "New York follows the common law rule that in interpreting a contract, the intent of the parties governs, and therefore, a contract should be construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (citation and internal quotation marks omitted). This intent is derived "from the plain meaning of the language employed." *Crane Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) (quoting *Tigue v. Commercial Life Ins. Co.*, 631 N.Y.S.2d 974, 975 (4th Dep't 1995)). "Under New York law the initial interpretation of a contract is a matter of law for the court to decide" and "[i]ncluded in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) (internal quotation marks and citation omitted); *see also Sutton v. E. River Sav. Bank*, 55 N.Y.2d 550, 554 (1982) ("[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court.").

Ambiguity does not exist when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355 (1978)). Conversely, "[a] contract is ambiguous when it is 'reasonably susceptible of more than one interpretation.'" *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573 (1986); *see also Health-Chem Corp. v. Baker*, 737 F. Supp. 770, 773 (S.D.N.Y. 1990) ("[A] term is ambiguous when it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" (quoting *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987))).

"Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). Furthermore, "[c]lear contractual language does not become ambiguous simply because the parties to the litigation argue different interpretations." *Maniolos v. United States*, 741 F. Supp. 2d 555, 569 (S.D.N.Y. 2010); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (explaining ambiguity does not exist "where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning'" (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957))).

When a contract's language is "clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." *Maniolos*, 741 F. Supp. 2d at 567. However, if the Court finds ambiguity in the contract, it must "resolve any contractual ambiguities in favor of the plaintiff" on a Rule 12(b)(6) motion, *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015), and a plaintiff's claim should not be dismissed if she "has an arguable claim under the contract." *Hermant Patel M.D., P.C. v. Bandikatla*, No. 18-cv-10227, 2019 WL 6619344, at *2, 2019 U.S. Dist. LEXIS 210405, at *5 (S.D.N.Y. Dec. 5, 2019). "Although courts may review extrinsic evidence to ascertain the intended meaning of an otherwise ambiguous contract, when considering a motion to dismiss, courts should resolve any contractual ambiguities in favor of the plaintiff without resorting to parol evidence." *D.C. USA Operating Co., LLC v. Indian Harbor Ins. Co.*, No. 07-cv-0116, 2007 WL 945016 at *8, 2007 U.S. Dist. LEXIS 25133, at *22 (S.D.N.Y. Mar. 27, 2007) (citing *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428-29 (2d Cir. 1992); *Subaru Distribs. Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)); *see also Bd. Of Trustees ex rel. Gen. Ret. Sys. Of Detroit v. BNY Mellon, N.A.*, No. 11-cv-6345, 2012 WL

3930112, at *3, 2012 U.S. Dist. LEXIS 132724, at *10-11 (S.D.N.Y. Sept. 10, 2012) (denying

motion to dismiss where, "[i]n light of [a contractual] ambiguity, the Court will need to examine

extrinsic evidence to determine the parties' intent in drafting the provision - an examination

inappropriate at this early stage of the litigation." (citing *Bayerische Landesbank, N.Y. Branch v.*

*Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012); *Eternity Global Master Fund Ltd.*

*v. Morgan Guar. Trust Co. of NY*, 375 F.3d 168, 178 (2d Cir. 2004))).

Defendant argues that Plaintiff's breach of contract claim must be dismissed because: (1)

the Complaint does not sufficiently allege that Defendant breached the Account Agreement as to

Plaintiff by using of the "available" balance, rather than the "actual" or "ledger" balance, to

calculate overdraft fees; (2) the Account Agreement cannot reasonably be read to mean

Defendant must use only the "actual" or "ledger" balance to determine whether an Overdraft or

NSF Fee should be charged; and (3) the Account Agreement cannot reasonably be understood to

limit NSF Fees for a particular transaction to one regardless of how many times the transaction is

presented for payment and returned. (Dkt. No. 15-1, at 14-22).

### 1.    Sufficiency of Plaintiff's Allegations of Breach

Defendant argues that Plaintiff's Complaint "fails to sufficiently allege facts showing that

she was harmed by [Defendant's] alleged use of the 'available' balance instead of the 'ledger'

balance." (Dkt. No. 15-1, at 14). Specifically, Defendant argues that the Complaint "does not

allege sufficient facts to establish whether [Defendant] used the 'available' or 'ledger' balance to

impose any of the fees" discussed therein, "[does] not establish that [Defendant's] use of the

'available balance' resulted in the alleged fees," and does not establish "that [Defendant's] use of

the 'ledger balance' would *not* have resulted in her incurring those fees." (*Id.* at 16; *see also* Dkt.

No. 18, at 4).

Plaintiff alleges that "[o]n December 24, 2018, when Plaintiff had $73.58 in her account, she engaged in a transaction for $51.29, leaving $22.29 in her account, but was nonetheless charged a $32 'Overdraft Fee' for it." (Dkt. No. 24-2, at ¶ 57). From the phrasing of this allegation, it is reasonable to infer that the phrase "$73.58 in her account" refers to Plaintiff's "actual" or "ledger" balance on December 24. It is also reasonable to infer that, because her actual balance on December 24 was sufficient to cover the transaction at issue, Plaintiff believes that Defendant's decision to charge an Overdraft Fee must have been based on her "collected available" or "artificial available" balance, which the Account Agreement allegedly forbids. Because the Court must draw all reasonable inferences in Plaintiff's favor at this stage, *EEOC*, 768 F.3d at 253, the Court finds that Plaintiff has sufficiently alleged at least one instance in which she was charged an Overdraft Fee based on Defendant's use of a methodology that was impermissible under the Account Agreement,[10] and therefore rejects Defendant's argument for dismissal on this ground.

### 2.    Calculating Overdraft Fees Using the "Available" Balance

Defendant also argues that the Account Agreement cannot reasonably be read to require Defendant to use an account's "actual" or "ledger" balance when determining whether to assess an Overdraft or NSF Fee. Defendant relies on language in the Account Agreement's Insufficient Funds section that requires customers to maintain a balance sufficient to cover all "initiated," as opposed to "settled" or "processed," transactions. (Dkt. No. 15-3, at 4 ("You must maintain a balance in your Account that will cover the checks you write and any other debits or similar transactions . . . *initiated by you* and any other fees or charges applied to your Accounts . . . If

---

[10] Plaintiff's allegations do not specify the actual, collected available or artificial available balance for her account at the time she was charged the other Overdraft and NSF Fees discussed in her Complaint. (Dkt. No. 24-2, at ¶ 57). Therefore, the Court cannot infer whether those fees also resulted from Defendant's use of the account's collected or artificial available balance.

you write a check or *initiate other debits or similar transactions* for more money than you have

in your Account, we have the option to either pay the check or other debit or similar transaction

or return it unpaid." (emphasis added)). Defendant argues that this language unambiguously puts

Plaintiff on notice that, if the amount of a particular transaction exceeds the total value of the

transactions she has initiated (including any unsettled transactions that are still pending), she may

be charged an Overdraft or NSF Fee, even if the balance in her account before accounting for

any pending transactions would be sufficient to cover the charge. (Dkt. No. 15-1, at 16-18; Dkt.

No. 18, at 4-7). Defendant also relies on the Account Agreement's Funds Availability Disclosure

section, which "contains multiple statements establishing that Plaintiff can only 'use [her funds]

to pay checks' or 'withdraw' her funds when they are 'available,'" and argues that no language

in the Account Agreement supports Plaintiff's contention that Defendant must "use the account's

'available' balance to determine availability of funds, but [must] use the 'ledger' balance to

determine when to impose overdraft fees." (Dkt. No. 15-1, at 19; Dkt. No. 18, at 7-8).

 Plaintiff counters that the Account Agreement nowhere suggests that Defendant may

"deduct pending debit card transactions from the balance in the account to determine whether to

assess [Overdraft] and NSF Fees." (Dkt. No. 16, at 9). Plaintiff argues that the Account

Agreement's Insufficient Funds section explains that Overdraft and NSF Fees will be charged

when a customer "initiate[s] debits or other similar transactions for *more money than you have in*

*your Account*," and never states that this determination will be based on the account's "available

balance," but instead consistently uses terms like "balance," "negative balance," "account

balance" and "sufficient [or insufficient] funds." (*Id.* at 9-10). Plaintiff further argues that the

Account Agreement's Funds Availability Disclosure section "has absolutely nothing to do with

holds on pending debit card transactions (the 'artificial available balance')," but instead "only

has to do with holds on deposits ('the collected available balance')," and "does not state these deposit holds can lead to fees." (*Id.* at 10-11). Plaintiff also points to the Account Agreement's "Statement Balance" section, which defines "statement balance" as "the balance in your Account regardless of when we receive credit for noncash items deposited by you as defined under our Funds Availability Policy," and the "Subaccounts" section, which states that "[t]he combined balances of [the 'transaction' and 'savings'] subaccounts will be used for the master Account balance for determining whether . . . transaction fees apply." (*Id.* at 11).

Plaintiff's interpretation of the contract is reasonable. As Plaintiff correctly points out, when explaining when Overdraft and NSF Fees will be assessed, the language in the Insufficient Funds section consistently refers to the account's "balance" and "money in [the] account" rather than the "available" balance. (Dkt. No. 15-3, at 4). The other contractual language Plaintiff points to could be read to suggest that the term "balance" (as distinct from "collected balance" or "available balance," terms used elsewhere in the Account Agreement, *see* (Dkt. No. 15-3, at 4, 10)), refers only to money actually in the account. From these provisions, an account-holder could reasonably believe that she will only be charged an Overdraft or NSF Fee if the amount of a transaction exceeds the funds actually in her account, without regard to any pending credits or debits. The Account Agreement's requirement that the consumer maintain a "balance" sufficient to cover "initiated" transactions does not unambiguously provide to the contrary. Rather, especially in light of the Insufficient Funds section's lack of any references to an "available" balance, this requirement could be read to simply mean that at the time a transaction is "initiated," the *actual* (not *available*) balance of the account must be sufficient to cover it.

The Account Agreement's Funds Availability Disclosure also does not unambiguously support Defendant's interpretation. That section merely explains how and when funds deposited

by the account-holder will become available for withdrawal and use. It does not explain how pending debits (as opposed to credits) will be used to determine an account's "available" balance, nor does it suggest that the "available" balance will be used for purposes of assessing Overdraft or NSF Fees. More importantly, as noted, the Insufficient Funds section, which *does* describe those fees, does not explicitly state that an account's "available" balance is relevant to the assessment of those fees, or otherwise link the mechanics of assessing those fees to the Funds Availability Disclosure.

Because the Account Agreement is at least ambiguous as to whether it permits Defendant to use a measure other than the account's actual balance before assessing an Overdraft or NSF Fee, dismissal of Plaintiff's breach of contract claim at this stage is inappropriate. This conclusion is in accordance with the weight of authority in this Circuit, in which courts have denied motions to dismiss based on similar ambiguities. *See, e.g.*, *Roy v. ESL Fed. Credit Union*, No. 19-cv-6122, 2020 WL 5849297, at *2-7, 2020 U.S. Dist. LEXIS 181148, at *4-21 (W.D.N.Y. Sept. 30, 2020) (finding that the defendant's "failure to explicitly state which method it uses to determine overdrafts, its failure to include the term 'available' in the definition of overdrafts, and its inconsistent use of the term 'available' throughout the Account Agreement creates an ambiguity" that "must be resolved in Plaintiff's favor" on a motion to dismiss); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 374-75 (D. Conn. 2018) (denying motion to dismiss where "there is a reasonable basis for a difference of opinion concerning" "whether the 'Account Agreement' terms indicate whether [the defendant] will use the 'available' balance or 'ledger' balance in determining overdraft fees"); *cf. Roberts v. Capital One, N.A.*, 719 F. App'x 33, 34-37 (2d Cir. 2017) (finding that contractual language was ambiguous as to whether it allowed the defendant to assess overdraft fees at the time of transactions' *settlement* after not

charging such a fee at the time of the transactions' *authorization*, and therefore that "dismissal was improper"); *Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 482-86 (E.D.N.Y. 2020) (reaching similar conclusion).

The cases Defendant relies on (all of which are from other Circuits) are readily distinguishable. In *Domman v. Summit Credit Union*, the court found that the account agreement's explicit statements that the decision whether to assess fees would be based on the "*available*" account balance and the amount of "*available*" funds, read in tandem with the agreement's Funds Availability Policy Disclosure, unambiguously allowed the defendant to assess fees based on the "available" balance rather than the actual balance. *See Domman v. Summit Credit Union*, No. 18-cv-167, 2018 WL 4374076, at *5-8, 2018 U.S. Dist. LEXIS 156514, at *12-20 (W.D. Wis. Sept. 13, 2018) (emphasis added). The court in *Page v. Alliant Credit Union* reached a similar conclusion, relying in particular on language that permitted withdrawals "only if your account has sufficient *available* funds" and specifying that fees would be charged "[i]f the amount of the item presented for payment exceeds the total *available* overdraft sources." *Page v. Alliant Credit Union*, No. 19-cv-5965, 2020 WL 5076690, at *3-4, 2020 U.S. Dist. LEXIS 154605, at *7-11 (N.D. Ill. Aug. 26, 2020) (emphasis added). In *Chambers v. NASA Federal Credit Union*, not only did the overdraft-related sections of the account agreement refer to "available" collected funds and "available" balances, the accompanying opt-in agreement provided specific examples of when an Overdraft Fee might be charged, including "when [the consumer 'inadvertently miscalculate[s] [her] *available* balance,' or 'when funds from a recent deposit are not *available*.'" *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1, 9-13 (D.D.C. 2016) (emphasis added).

By contrast, nowhere does the Account Agreement at issue here use the "available" qualifier when describing how an account's balance will be calculated for the purpose of assessing Overdraft or NSF Fees, nor does the Account Agreement otherwise explicitly "link[] the concept of available balance [as described in the Funds Availability Disclosure section] to the mechanics of when and how the bank would assess overdrafts." *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1242 (11th Cir. 2019) (finding dismissal inappropriate where, unlike in *Chambers*, the agreements "did not use the phrase 'available balance'; the Account Agreement nowhere explained the mechanics of how and when [the defendant] would assess overdrafts, nor linked the concept of an 'available balance' to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have 'enough money' to cover a transaction and thereby trigger an overdraft").

Because the Complaint sufficiently alleges that the Account Agreement is at least ambiguous with respect to whether it allows Defendant to assess an Overdraft or NSF Fee based on a measure other than an account's actual balance, Plaintiff's claim that Defendant breached the Account Agreement by doing so survives dismissal.

### 3.    Charging Multiple NSF Fees for the Same Transaction

Defendant also argues that the Account Agreement cannot reasonably be read to limit Defendant to a single NSF Fee per rejected transaction, regardless of how many times the transaction is re-presented for payment and rejected. Defendant points to language providing that it may impose such charges "for each check or other debits or similar transactions presented against insufficient funds" and that it "has the right to return unpaid any checks on your Account that are presented for payment and to assess a service charge for making such returns." (Dkt. No. 15-3, at 4, 10). Defendant argues that this language unambiguously allows it to assess an NSF

fee for *each* returned transaction, without regard to whether the rejected transaction is a new transaction or a re-presentation of a prior transaction. (Dkt. No. 18, at 9-12).

Plaintiff argues that the Account Agreement and Fee Schedule allow Defendant to charge a single $32 NSF Fee for each "item" that is returned due to insufficient funds, and nowhere suggest that a separate fee may be charged for each "presentment" or "retry" of the item. (Dkt. No. 16, at 17-18). Plaintiff's position is that the term "item" refers to a single *order or instruction for payment* by the account-holder (regardless of how many times the merchant or vendor presents the transaction for payment), and she argues that because the Account Agreement nowhere specifies that the term actually refers to a single *presentation* of that transaction for payment by the merchant or vendor, the term is at least ambiguous. (*Id.*). In support of her interpretation, Plaintiff also argues that the Black's Law Dictionary definition of the term "item"—a "negotiable instrument or a promise or order to pay money handled by a bank for collection or payment"—is consistent with Plaintiff's construction of "item" as "an order by the accountholder to pay," "not a third party's resubmission of a previous payment request." (*Id.* at 23). Plaintiff also points to language in the Account Agreement stating that, where an account has insufficient funds to cover a transaction, Defendant "may honor the check or other item and create *an* overdraft," and argues that the use of the singular term "overdraft" suggests that Defendant may only charge a single Overdraft or NSF Fee for a particular rejected check or other transaction. (*Id.* at 21 n.7).

The Court finds that the Account Agreement is facially ambiguous. While the Fee Schedule provides for a $32 NSF Fee "per item," (Dkt. No. 17-11), the Account Agreement does not define the term "item."  There is no provision making clear that a separate NSF Fee may be charged for each presentment of the same transaction. The specific provisions Defendant relies on could reasonably be read as either authorizing Defendant to charge a single NSF Fee for *each check, debit or other*

*transaction* that is presented for payment, regardless of how many times a merchant unsuccessfully

attempts to present the transaction (as Plaintiff urges), or as authorizing Defendant to charge a NSF

Fee *each time* a transaction is presented and returned for nonpayment (as Defendant urges).

The parties also cite significant evidence extrinsic to the Account Agreement to support

their respective interpretations. For instance, the Complaint cites to language allegedly used in

account agreements from several other financial institutions with clearer language specifying that

an NSF Fee will be charged for each "presentment" of the same "item" or "transaction." (Dkt.

No. 24-2, at ¶¶ 35-53). Plaintiff argues that these examples support her interpretation of the

Account Agreement because: "(a) they indicate that the precise practice challenged here—

assessment of Multiple Fees on the same item—is commonly expressly disclosed in banking, and

(b) they show there is a broad usage throughout banking where 'item' means what Plaintiff says

it means in the absence of contract language defining that key term otherwise." (Dkt. No. 16, at

22). Both parties also argue that the Operating Rules and Guidelines promulgated by the

National Automated Clearing House Association (the "NACHA Rules") to govern ACH

transactions support their respective interpretations of "item."[11] However, because the Court finds

that the Account Agreement is ambiguous, it may not resolve that ambiguity at the motion to dismiss

---

[11] The Account Agreement provides that "the operating rules" of the NACHA "are applicable to ACH transactions." (Dkt. No. 15-3, at 10). While the NACHA Rules are not incorporated by reference in the Complaint, the Court could take judicial notice of them and thus "consider [them] on a motion to dismiss without converting it into a motion for summary judgment." *Coleman v. Alaska USA Fed. Credit Union*, No. 19-cv-0229, 2020 WL 1866261, at *4, 2020 U.S. Dist. LEXIS 3301, at *11 (D. Ak. Apr. 14, 2020); *cf. Olagues v. Perceptive Advisers LLC*, No. 15-cv-1190, 2016 WL 4742310, at *2, 2016 U.S. Dist. LEXIS 122436, at *4 (S.D.N.Y. Sept. 9, 2016) ("The Court may also take judicial notice of the public rules of the Options Clearing Corporation ('OCC') . . . under Federal Rule of Evidence 201." (citing *Forgione v. Gaglio*, No. 13-cv-9061, 2015 WL 718270, at *17, 2015 U.S. Dist. LEXIS 21644, at *49-50 (S.D.N.Y. Feb. 13, 2015))). However, as noted below, the Court may not consider extrinsic evidence to construe the terms of an ambiguous contract when resolving a motion to dismiss, and even if it were to consider the NACHA Rules, both parties put forth contrasting interpretations of the NACHA Rules that support their respective interpretations of the Account Agreement. Therefore, the Court finds consideration of the NACHA Rules unnecessary to its decision, and denies Plaintiff's request to take judicial notice of them. (Dkt. No. 17, at 2-3). Because it is not taking judicial notice of the NACHA Rules, the Court also declines to take judicial notice of the fact that NACHA "is an association of financial institutions who use the Automated Clearing House ('ACH') network" that "promulgates rules for use of the ACH that participating financial institutions agree to follow." (Dkt. No. 17, at 2).

stage by referring to extrinsic evidence. *See, e.g., D.C. USA Operating Co., LLC*, 2007 WL 945016 at *8, 2007 U.S. Dist. LEXIS 25133, at *22; *Bd. Of Trustees ex rel. Gen. Ret. Sys. Of Detroit*, 2012 WL 3930112, at *3, 2012 U.S. Dist. LEXIS 132724, at *10-11.

Therefore, the Court finds that the Account Agreement is sufficiently ambiguous for Plaintiff's claim to survive a motion to dismiss. This conclusion is consistent with the weight of authority in this Circuit and others. When analyzing similar account agreements that allow NSF Fees to be assessed on a "per item" basis, courts have frequently found the term "item" to be ambiguous in the absence of language clearly defining it, and have denied motions to dismiss on that basis. *See, e.g.*, *McNeil v. Capital One Bank, N.A.*, No. 19-cv-00473, 2020 WL 5802363, at *1-2, 2020 U.S. Dist. LEXIS 179672, at *3-4 (E.D.N.Y. Sept. 29, 2020) (denying motion to dismiss where "'[b]oth parties have offered reasonable interpretations' of the Account Agreements" as to whether language allowing the defendant to "charge a fee for each item returned in accordance with [its fee schedule]" allows it to assess fees for each presentment of the same transaction (citations omitted)); *Roy*, 2020 WL 5849297, at *8-10, 2020 U.S. Dist. LEXIS 181148, at *21-29 (denying motion to dismiss on this issue where "the Account Agreement does not define 'item' and the parties dispute its meaning," and both parties presented reasonable interpretations); *Perks v. TD Bank, N.A.*, 444 F. Supp. 3d 635, 639-41 (S.D.N.Y. 2020) (finding contractual definition of "item" ambiguous as to whether it allowed an NSF Fee to be charged for each presentment of a transaction, finding that both parties had presented plausible interpretations of that definition, and denying motion to dismiss); *Chambers v. HSBC Bank USA, N.A.*, No. 19-cv-10436, 2020 WL 7261155, at *3-5, 2020 U.S. Dist. LEXIS 232851, at *5-13 (S.D.N.Y. Dec. 10, 2020) (relying on *Perks* and reaching the same conclusion); *see also* (Dkt. No. 16, at 18 n.6 (citing additional cases from other jurisdictions reaching similar results)).[12]

---

[12] Plaintiff requests that this Court take judicial notice of various court filings and decisions, from this Circuit and other state and federal courts, that are unrelated to the present action, and which Plaintiff cites as authority to support her legal arguments. (Dkt. No. 17, at 3-5). The Court may consider the decisions of other courts without taking judicial notice of them, and while "[judicial notice of public records such as court filings[] is clearly appropriate," *In re Enron*

Defendant urges the Court to follow *Page v. Alliant Credit Union* and *Lambert v. Navy Fed. Credit Union*, two out-of-circuit cases in which courts found that an account agreement unambiguously allowed the defendant financial institution to charge a separate NSF Fee each time a transaction was presented for payment and rejected. In *Lambert*, the contract specifically defined "debit item" to include, among other things, "all . . . Automated Clearing House (ACH) debits." *Lambert v. Navy Federal Credit Union*, No. 19-cv-103, 2019 WL 3843064, at *3, 2019 U.S. Dist. LEXIS 138592, at *9 (E.D. Va. Aug. 14, 2019). Furthermore, "[b]oth parties agree[d] that an 'item' is a request or invitation for payment." *Id.* Citing this language, the Court found that "it is clear from the contract that ACH debit requests, such as the two submitted by Plaintiff's insurer, qualify as 'debit items.'" *Id.* The Court also observed that the contract "warn[ed] Navy Federal Credit Union members that '[a]n ACH debit might be made as a result of an authorization you gave a third party to automatically transfer funds from your account to pay your monthly insurance premium, utility bills, or car payment,' as happened when Plaintiff's insurer submitted the second request for payment." *Id.*, 2019 WL 3843064, at *3, 2019 U.S. Dist. LEXIS 138592, at *9-10 (record citation omitted). The court then looked to contractual provisions specifying that the defendant "may return debits to the checking account (e.g., an ACH payment) if the amount of the debit exceeds funds available in the checking account," that "[a] fee may be assessed . . . for each returned debit item," and that "[a] fee will be assessed . . . for each refused check." *Id.* at *4, 2019 U.S. Dist. LEXIS 138592, at *10-13. Reading all these provisions together, the court concluded that the contract as a whole "unambiguously provides that 'each' time Navy Federal Credit Union 'returns' a request for payment (a 'debit item') for insufficient funds, a nonsufficient fund fee may be assessed without regards to

*Corp.*, 379 B.R. 425, 431 n.18 (S.D.N.Y. 2007), here the Court finds it unnecessary to consider filings in unrelated cases in order to analyze the language of the Account Agreement. Therefore, the Court denies Plaintiff's request for judicial notice of these documents, (Dkt. No. 17, at 3-5), but has considered the court decisions Plaintiff submits as persuasive authority in evaluating the parties' legal arguments.

whether the returned debit item was a re-presentation of a previously rejected request." *Id.* at *5, 2019 U.S. Dist. LEXIS 138592, at *13-14.

The contract language here compels a different conclusion. Unlike in *Lambert*, the Account Agreement here "does not define 'item' as broadly as a request for payment," or specify that the term "item" should be read to include *all* ACH debits, including those initiated by third parties without an account-holder's authorization; indeed, the Account Agreement does not provide a definition of "item" at all. *Perks*, 444 F. Supp. 3d at 641 (distinguishing *Lambert*). Nor does the Account Agreement otherwise contain a clear warning that a payment request submitted by a third party, unauthorized by the account-holder, may trigger a NSF Fee; to the contrary, in discussing the circumstances under which an Overdraft or NSF Fee may be triggered, the "Insufficient Funds" section repeatedly refers to transactions "initiated by" the account-holder. (Dkt. No. 15-3, at 4). Here, unlike *Lambert*, the Account Agreement is ambiguous as to whether a third party's second or third re-presentation of a transaction that an account-holder authorized only once constitutes a new "item" that could trigger a separate NSF Fee.

Furthermore, the specific provisions of the Account Agreement that Defendant relies on are less clarifying than the relevant provisions in *Lambert*. Beginning with Insufficient Funds section itself, the relevant language does not explicitly state that an NSF Fee will be assessed "for each *returned* debit item" or "each *refused* check," as the *Lambert* language does, but rather states that an NSF Fee will be assessed for "each *check or other debits or similar transactions* presented against insufficient funds." (Dkt. No. 15-3, at 4 (emphasis added)). Thus, in comparison to the Account Agreement's Insufficient Funds section, the relevant provisions in *Lambert* more directly stated that a fee would be assessed *each time* an item was *returned for nonpayment*, putting the account-holder on notice that she may be charged multiple NSF Fees if a particular item is presented and returned multiple times. By contrast, the Account Agreement's plain language

could reasonably be read as allowing Defendant to charge a single NSF Fee for each *check, debit or similar transaction* that is presented for payment, regardless of how many times that check, debit or similar transaction is presented and returned.

The Account Agreement's separate provision giving Defendant "the right to return unpaid any checks on your Account that are presented for payment and to assess a service charge for making such returns," (Dkt. No. 15-3, at 10), comes closer to the *Lambert* language. Importantly, however, this provision on its face applies to "checks"; it does not reference other "items" such as ACH debits. Therefore, even assuming this language unambiguously provides that NSF Fees on *checks* are triggered each time the check is presented for payment (whether authorized by the account-holder or not), a reasonable account-holder could certainly believe that this language applies *only* to checks, and would not necessarily understand it to mean that initiating *any* transaction could ultimately lead to multiple NSF Fees.

Even as to checks, however, the provision is less clear than the *Lambert* language allowing a fee to be charged "for *each* returned debit item" or "*each* refused check." The Account Agreement simply says that Defendant reserves the right to assess a "service charge" for returning presented checks unpaid; it does not unambiguously state that a separate "service charge" will be assessed *each time* the *same* check is unsuccessfully presented for payment and returned *without the account-holder's authorization*. And while the language could reasonably be interpreted that way, an interpretation to the contrary is not unreasonable when the provision is read in light of the entire Account Agreement. As discussed, the Account Agreement read as a whole provides that transactions *initiated by the account-holder* will trigger NSF Fees, (Dkt. No. 15-3, at 4), and that a $32 "per item" fee will be charged for overdrafts and checks returned for insufficient funds, (Dkt. No. 17-11), but lacks a definition of that term, much less one that would

put an account-holder on notice that she may be charged each time a *merchant* (as distinct from the account-holder herself) presents a transaction for payment. Thus, considering the language of this Account Agreement, it is ambiguous whether an account holder may be charged multiple NSF Fees based on a *merchant's* repeated attempts to receive payment on the check.

*Page* is similarly distinguishable. The relevant contractual language in *Page* reads as follows: "Whether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule . . . [I]f the amount of the item presented for payment exceeds the total available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable fees." *Page*, 2020 WL 5076690, at *4, 2020 U.S. Dist. LEXIS 154605, at *11. The court found that this language "does not promise members that [the defendant] will charge just one overdraft fee per transaction," and determined that "in the context of the entire Membership Agreement, [it was unambiguous that the defendant] charges its members an overdraft fee every time a third-party payee presents an item for payment against insufficient available funds." *Id.* at *4, 2020 U.S. Dist. LEXIS 154605, at *11-12. The court, however, did not describe how the "context of the entire" contract, or any other particular provisions of the contract, informed its view that the cited language was unambiguous, nor did the court explicitly address any arguments regarding potential ambiguity in the term "item." *Id.*

In any event, having reviewed the caselaw cited by the parties, the Court follows the overwhelming weight of authority, in this Circuit and elsewhere, finding ambiguities when assessing similar contract language. Because the Complaint sufficiently alleges that the Account Agreement is ambiguous with respect to whether it allows Defendant to charge an NSF Fee each time a transaction is presented for payment and rejected, Plaintiff's claim that Defendant breached the Account Agreement by doing so survives dismissal.

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 372-73 (S.D.N.Y. 2016) (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015)). A "breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed." *Id.* (quoting *Yu*, 97 F. Supp. 3d at 482); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."). "Under New York law, claims [for breach of contract and breach of the implied covenant of good faith and fair dealing] are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 50 (1st Dep't 2010)).

Defendant argues that Plaintiff's implied covenant claim must be dismissed "because [Defendant] acted in accordance with the Account Agreement" and because "the claim is duplicative of [Plaintiff's] breach of contract claim." (Dkt. No. 15-1, at 22-24; *see also* Dkt. No. 18, at 12). Plaintiff relies on *McNeil v. Capital One Bank, N.A.*, an Eastern District of New York case, to argue that "[a]t this early stage of a proceeding, [she is] entitled to plead alternative and inconsistent causes of action and to seek alternative forms of relief," and her claim therefore should not be dismissed. (Dkt. No 16, at 25-26 (quoting *McNeil*, 2020 WL 5802363, at *2, 2020 U.S. Dist. LEXIS 179672, at *5) (internal quotation marks omitted)). Since the Court has already found that Plaintiff has adequately alleged that Defendant breached the Account Agreement, Defendant's

first argument clearly fails. Therefore, the remaining question is whether Plaintiff's implied covenant claim must be dismissed as duplicative of her breach of contract claim.

Plaintiff's implied covenant claim is based largely on the same alleged facts underlying her breach of contract claim. Plaintiff alleges that Defendant acted in bad faith by assessing Overdraft and NSF Fees based on her account's available, rather than actual, balance and by charging Plaintiff multiple NSF Fees for the same transaction, in violation of its promises in the Account Agreement. (Dkt. No. 24-2, at ¶¶ 81-88). Notwithstanding *McNeil*, most courts in this Circuit have, consistent with New York law, dismissed implied covenant claims as duplicative in similar circumstances. *See, e.g., Lussoro*, 456 F. Supp. 3d at 486; *Chambers*, 2020 WL 7261155, at *5, 2020 U.S. Dist. LEXIS 232851, at *13-14; *Kelly v. Cmty. Bank, N.A.*, No. 19-cv-919, 2020 WL 777463, at *7, 2020 U.S. Dist. LEXIS 26925, at *19-20 (N.D.N.Y. Feb. 18, 2020).

Plaintiff's only arguably non-duplicative allegation is her contention that Defendant "unilaterally elected to and did program its software to create accounting gimmicks which would maximize its overdraft and NSF fees," and that by "implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith." (*Id.* ¶ 87). However, this is simply another way of alleging that Defendant exploited an ambiguity in the Account Agreement, adopted the interpretation of the Account Agreement that would maximize the amount of Overdraft and NSF Fees it could charge, and programmed its software accordingly. Thus, the allegation is simply a "repackaging of [her] breach of contract theory," not a basis for a separate, distinct claim. *Perks*, 444 F. Supp. 3d at 641 ("The implied covenant of good faith is directed to the parties' promised performances, not their interpretations of the contract . . . When one party to a contract advances an interpretation that the other party disagrees with, breach of the express provision of the contract

is the appropriate cause of action."); *see also Roy*, 2020 WL 5849297, at *10, 2020 U.S. Dist. LEXIS 181148, at *29-30 (finding that the plaintiff's "claim that [the defendant] uses its discretion to interpret the Account Agreement in bad faith is just another way of alleging that the agreement is ambiguous and Plaintiff objects to [the defendant's] interpretation of it," and dismissing the implied covenant claim as duplicative of the breach of contract claim).

While Plaintiff is correct that she is entitled to plead *alternative and inconsistent* causes of action, she has not done so here; instead, she has pled a *duplicative* cause of action. Therefore, her implied covenant claim must be dismissed.

### D.      Unjust Enrichment/Restitution and Money Had and Received

Restitution "is a form of equitable relief." *Judge Rotenberg Educ. Ctr. Inc. v. Blass*, 882 F. Supp. 2d 371, 376 (E.D.N.Y. 2012). "There are various rubrics under which one can recover restitution for benefits it voluntarily conferred, including quasi-contract, unjust enrichment, and quantum meruit. These rubrics are not necessary mutually exclusive and often blend together." *Id.* A claim of money had and received also "sounds in quasi contract." *Rocks & Jeans, Inc. v. Lakeview Auto Sales & Serv., Inc.*, 584 N.Y.S.2d 169, 170 (1st Dep't 1992). Such claims "[a]re not separate causes of action under New York law, but are instead conceptualized as different facets of a single quasi contract cause of action and should be treated as such." *DeSilva v. North Shore-Long Island Jewish Health Sys., Inc.*, No. 10 Civ. 1341, 2012 WL 748760, at *9 n.12, 2012 U.S. Dist. LEXIS 30597, at *34 n.12 (E.D.N.Y. Mar. 7, 2012). Therefore, the Court analyzes Plaintiff's third cause of action (unjust enrichment/restitution) and fourth cause of action (money had and received) together.

To prevail on such a claim in New York, a plaintiff must establish: "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *Dolmetta v. Uintah*

*Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)). "The 'essence' of such a claim 'is that one party has

received money or a benefit at the expense of another.'" *Id.* (quoting *City of Syracuse v. R.A.C.*

*Holding, Inc.*, 685 N.Y.S.2d 381, 382 (4th Dep't 1999)). Unjust enrichment is "an obligation the

law creates *in the absence of any agreement.*" *Beth Israel Med. Ctr. v. Horizon Blue Cross &*

*Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Goldman v. Metro. Life Ins.*

*Co.*, 5 N.Y.3d 561, 572 (2005)). As the New York Court of Appeals has explained, "[t]he

existence of a valid and enforceable written contract governing a particular subject matter

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."

*Clark-Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388 (1987). Therefore, "[a]n unjust

enrichment claim is not available where it simply duplicates, or replaces, a conventional contract

or tort claim." *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012) (collecting cases).

Defendant argues that Plaintiff's quasi-contract claims must be dismissed because the

relationship between the parties is governed by the Account Agreement, and her breach of

contract claim thus provides an adequate remedy at law. (Dkt. No. 15-1, at 24-25; Dkt. No. 18, at

12). In response, Plaintiff relies on *Story v. SEFCU*, No. 18-cv-764, 2019 WL 2369878, 2019

U.S. Dist. LEXIS 94049 (N.D.N.Y. June 5, 2019), a decision from this District, to argue that she

may pursue her quasi-contract claims as alternative theories to her breach of contract claims.

(Dkt. No. 16, at 26).

*Story* involved a motion to dismiss for lack of standing, rather than for failure to state a

claim. The *Story* court acknowledged that "Plaintiff's claim for unjust enrichment is likely

precluded by the Opt-In Contract, provided that the Opt-In Contract is an enforceable agreement

about the assessment of overdraft fees." 2019 WL 2369878, at *6, 2019 U.S. Dist. LEXIS 94049,

at *16. Nonetheless, the court declined to dismiss the claim at the standing stage because, given

disputes about whether the parties had actually executed a valid contract, "at this stage of the proceedings, the Court does not know for a fact whether a contract exists between Plaintiff and Defendants." *Id.*

By contrast, here, no party seriously disputes that the Account Agreement is a valid, enforceable contract that governs the issues raised in the Complaint; the only disputes relate to the interpretation of particular provisions. Under these circumstances, courts in this Circuit have generally dismissed quasi-contract claims. *See, e.g., McNeil*, 2020 WL 5802363, at *3, 2020 U.S. Dist. LEXIS 179672, at *6-7; *Chambers*, 2020 WL 7261155, at *6, 2020 U.S. Dist. LEXIS 232851, at *15-16; *Perks*, 444 F. Supp. 3d at 642. Likewise, here, Plaintiff's claims for unjust enrichment/restitution and money had and received must be dismissed.

### E.      Violation of NYGBL § 349

NYGBL § 349 prohibits "[d]eceptive acts or practice in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). "The elements of a deceptive trade practices claim under NYGBL § 349 are: '(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result.'" *Toth v. 59 Murray Enters., Inc.*, No. 15-cv-8028, 2019 WL 95564, at *13, 2019 U.S. Dist. LEXIS 1355, at *36 (S.D.N.Y. Jan. 3, 2019) (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009)). "The gravamen of" a complaint brought under NYGBL § 349 "must be consumer injury or harm to the public interest." *Gibson v. SCE Grp., Inc.* 391 F. Supp. 3d 228, 251 (S.D.N.Y. 2019) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and citation omitted)). This is because "the statute is, at its core, a consumer protection device." *Securitron*, 65 F.3d at 264.

Defendant's only arguments for dismissal of Plaintiff's NYGBL § 349 claim are that: (1) Defendant cannot be liable under § 349 because it "acted in accordance with the unambiguous terms of the Account Agreement," (Dkt. No. 15-1, at 25), and (2) Plaintiff's § 349 claim is "duplicative of her breach of contract claim,"[13] (Dkt. No. 18, at 13). Plaintiff contests both arguments. (Dkt. No. 16, at 26-28). As this Court has already found Plaintiff's allegations that Defendant breached its contractual promises to be sufficient in the context of Plaintiff's breach of contract claim, Defendant's first argument fails.

The Court also declines to dismiss Plaintiff's § 349 claim as duplicative of her breach of contract claim. The Court recognizes that some courts in this Circuit adjudicating similar cases have dismissed § 349 claims that fail to allege "an act or practice that was misleading in a material respect separate and apart from the" allegations that the defendant violated the contract. *Perks*, 444 F. Supp. 3d at 642; *see also Chambers*, 2020 WL 7261155, at *5-6, 2020 U.S. Dist. LEXIS 232851, at *14-15 (reaching the same conclusion and dismissing the plaintiff's § 349 claim). Other courts, however, have allowed § 349 claims to proceed alongside breach of contract claims where, as here, a plaintiff alleges that a defendant used misleading contractual language to deceive consumers about the true nature of the defendant's Overdraft and NSF Fee practices. *See, e.g.*, *Lussoro*, 456 F. Supp. 3d at 490-91 ("Here, Plaintiff alleges that the Contract and Opt-In Form materially mislead a reasonable consumer into thinking that Defendant will only assesses overdraft fees when transactions overdraw a customer's account, when that is not the case in practice . . . [T]he allegation is not that Defendant mistakenly imposed an overdraft fee, but rather that the Contract and Opt-In Form trick a consumer, even if unintentionally, into

---

[13] Defendant raised this second argument for the first time in its reply. While it is "well-established that arguments may not be made for the first time in a reply brief," *Zirogiannis v. Seterus, Inc.*, 221 F. Supp. 3d 292, 298 (E.D.N.Y. 2016), *aff'd*, 707 F. App'x 724 (2d Cir. 2017), as discussed below, the Court rejects it on its merits in any event.

believing they will only be assessed an overdraft fee at the time of authorization, when, in fact, Defendant also imposes overdraft fees at the time of settlement, even as to previously authorized debit card transactions."); *McNeil*, 2020 WL 5802363, at *2-3, 2020 U.S. Dist. LEXIS 179672, at *5-6 (finding that an allegation that the defendant "engaged in deceptive business acts and practices under the GBL by defining the key term 'item' in an unexpected and misleading way" "*is* separate from the breach of contract claim" and supports an independent § 349 cause of action).

In a similar vein, relying on recent Second Circuit case law, some courts in this Circuit have allowed § 349 claims to proceed alongside breach of contract claims even where the harm alleged for the § 349 claims is identical to the loss alleged for the breach of contract claims. As the *Lussoro* court explained:

> "[I]n a recent case, *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107 (2d Cir. 2017), the Second Circuit emphasized that no such broad requirement [to state independent damages for a § 349 claim] exists under New York law." *Donnenfeld*, 333 F. Supp. 3d at 224. In *Nick's Garage*, the Second Circuit found that a plaintiff had adequately alleged a § 349 claim even though the damages alleged for his § 349 claim were the same as those alleged for his breach of contract claim . . . Here, Plaintiff does not allege damages related to the purchase price of the Contract, but rather that she was charged fees pursuant to the Contract that, but for Defendant's deceptive conduct, she would not have been charged. This is more akin to damages related to overpaying for an item as a result of a defendant's deceptive conduct, a type of injury that is sufficient to state a § 349 damages claim . . .   The Court therefore finds that Plaintiff's stated damages, even though they are the same as the alleged damages for her breach of contract claim, are sufficient to allege an injury for her § 349 claim.

*Lussoro*, 456 F. Supp. 3d at 492; *see also Roy*, 2020 WL 5849297, at *11, 2020 U.S. Dist. LEXIS 181148, at *31-32 ("In [*Nick's Garage*], the Second Circuit stated that no broad requirement of damages independent from breach of contract damages exists for GBL claims. Rather, it explained that New York courts found no GBL injury 'where the plaintiffs alleged damages in the amount of the purchase price of their contracts, but failed to allege that

defendants had denied them the services for which they contracted.' . . . The Court is (*sic*) therefore declines to dismiss Plaintiff's GBL claim merely on the argument that it is duplicative of the breach of contract claim.").

As in the foregoing cases, Plaintiff has alleged that Defendant's misleading contractual language caused her to incur Overdraft and NSF Fees that, but for Defendant's deceptive conduct, she would not have been charged. (Dkt. No. 24-2, at ¶¶ 95-101). Defendant has not addressed these cases as they relate to Plaintiff's § 349 claim, and the Court finds their reasoning persuasive. Therefore, Plaintiff's § 349 claim survives dismissal.

## V.    MOTION TO STRIKE

### A.    Legal Standard

Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Whether to grant or deny a Rule 12(f) motion is within the discretion of the district court, and such motions are generally disfavored and should be rarely granted. *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15 (D. Conn. 2013). Because "courts should not tamper with the pleadings unless there is a strong reason for so doing," a motion to strike will be denied "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). To prevail, the movant must show that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Securities Litigation*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (citing *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010)).

B.      **Analysis**

Defendant asks the Court to strike paragraphs 20 and 21 of Plaintiff's Complaint, which

describe Regulation E of the Electronic Fund Transfers Act, 12 C.F.R. § 1005.17 ("EFTA"), on

the grounds that Plaintiff does not bring any claims for violations of the EFTA, and that therefore

"any evidence relating to such violations would be entirely irrelevant, and thus inadmissible."

(Dkt. No. 15-1, at 26). Defendant argues that leaving the allegations in the Complaint will

prejudice Defendant by "confus[ing] the public—and potential jury pool—as to what claims and

facts [Plaintiff] actually alleges against [Defendant], and by "improperly broadening the scope of

discovery to irrelevant and trivial matters and forcing [Defendant] to incur unnecessary litigation

costs." (*Id.* at 27). Plaintiff argues that the allegations should not be dismissed at this stage

because "discovery will be necessary to determine whether" Defendant engaged in a program

that would subject it to Regulation E; that "even if it did not, the two Paragraphs further

demonstrate the importance of the consumer issue at stake here to the public, and therefore are

relevant to the GBL claim"; that there is "nothing 'scandalous' about these allegations"; and that

"[b]y the time of a jury trial, discovery will further sort out whether it is appropriate for them to

remain in the Complaint." (Dkt. No. 16, at 28).

Defendant is correct that Plaintiff does not bring a claim for violations of Regulation E.

Defendant also correctly points out that, according to the Account Agreement, it does not engage

in the type of conduct that would implicate Regulation E (*i.e.* charging Overdraft or NSF Fees

for ATM withdrawals or one-time Point of Sale/Debit Card transactions), (Dkt. No. 15-3, at 4),

and the Complaint does not allege that Defendant ever did so. Thus, the allegations are not

directly relevant to Plaintiff's claims.

However, the challenged allegations do not accuse Defendant of violating Regulation E,

or even say anything about Defendant at all. They merely form part of a longer set of background

allegations that provide general information on the harm Overdraft and NSF Fees pose to consumers generally, as well as the federal government's recognition of this harm and attempts to mitigate it through regulatory action. (Dkt. No. 24-2, at ¶¶ 16-21). "[E]ven assuming that a portion of the background material is irrelevant or immaterial, allegations that 'supply background or historical material or other matter of an evidentiary nature' normally will 'not be stricken from the pleadings unless they are unduly prejudicial to the defendant.'" *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 67-68 (E.D.N.Y. 2011) (quoting *Impulsive Music v. Pomodoro Grill,* No. 08-cv-6293, 2008 WL 4998474, at *3, 2008 U.S. Dist. LEXIS 94148, at *8 (W.D.N.Y. Nov. 19, 2008)). "A defendant's request to strike irrelevant material from the pleadings should be denied absent a showing that the challenged portion of the pleading has no bearing on the subject matter of the litigation and that its inclusion would prejudice the defendant." *Impulsive Music*, 2008 WL 4998474, at *3, 2008 U.S. Dist. LEXIS 94148, at *8.

At this early stage, the Court cannot say with certainty that the challenged allegations have *no* bearing on the issues in the case. They clearly relate to the general subject matter of the litigation, if only as background, and issues surrounding their "relevancy and admissibility . . . 'require the context of an ongoing and unfolding trial in which to be properly decided' and in any event should not be decided 'on the sterile field of the pleadings alone.'" *Lynch*, 278 F.R.D. at 68 (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).

Nor does the Court find that leaving the allegations in the Complaint at this stage would unduly prejudice Defendant. As noted, the allegations say nothing at all about Defendant, much less anything scandalous or offensive. Furthermore, Defendant's concern that leaving the allegations in the Complaint will confuse the public and potential jury pool about what claims

Plaintiff actually asserts does not demonstrate prejudice. "Concerns that a jury may be prejudiced by allegations in a complaint are [ ] insufficient [to grant a motion to strike], as the Court does not submit pleadings to a jury in civil cases." *Shouq v. Norbert E. Mitchell Co., Inc.*, No. 18-cv-00293, 2018 WL 4158382, at *4, 2018 U.S. Dist. LEXIS 148001, at *11 (D. Conn. Aug. 30, 2018) (citation omitted). In any event, any concern about potential confusion is mitigated given that the allegations are included in the context of a background discussion, they do not accuse Defendant of violating Regulation E, the Complaint does not assert a cause of action based on Regulation E, and the Complaint does not contain any other allegations stating or implying that Defendant has violated Regulation E.

Finally, Defendant's concern that leaving the allegations in will lead to unduly burdensome discovery is premature. Discovery in federal court is limited to evidence that is "relevant to any party's claim or defense" and "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Defendant merely seeks to strike background allegations, not substantive allegations that support any particular claim. Whether the challenged allegations remain in the Complaint or not, the scope of permissible discovery remains the same.

Defendant points to no cases in which a court has struck background allegations in circumstances analogous to those at issue here.[14] Given the early stage of the litigation, the high

---

[14] The cases Defendant cites to support its arguments are inapposite. In *Low v. Robb*, the background allegations the court struck were not simply irrelevant, but instead consisted of "broad, *ad hominem* character attacks" against the defendant, "disparaging comments [about the defendant] on matters that are simply not pertinent to any material issue," and "an attempt to gin up resentment against [the defendant] on the part of a potential jury, or, more generally, to embarrass him." *Low v. Robb*, No. 11-cv-2321, 2012 WL 173472, at *10-11, 2012 U.S. Dist. LEXIS 6836, at *27-30 (S.D.N.Y. Jan. 20, 2012). Similarly, the allegations at issue in *Lynch v. Southampton Animal Shelter Foundation Inc.* largely consisted of scandalous allegations about the animal shelter's allegedly abusive practices that are not relevant here; notably, however, when evaluating the allegations that were arguably "irrelevant or immaterial" background, the court *declined* to strike those allegations because it found that they were not unduly prejudicial. *Lynch*, 278 F.R.D. at 67-68. In *Coach, Inc. v. Kmart Corp.*, the court struck a number of affirmative defenses after finding them to be legally insufficient, on the grounds that the plaintiff would be unduly prejudiced by having to conduct discovery into and litigate a legally insufficient defense—a far stronger basis for granting a

burden Rule 12(f) imposes on parties seeking to invoke it, and the Court's broad discretion in ruling on a Rule 12(f) motion, the Court declines to strike the challenged allegations at this time.

## VI.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that, no later than 14 days from the date of this Decision, Plaintiff is directed to file a clean (i.e. not redlined) version of her Proposed First Amended Complaint, and that this Complaint will be the operative pleading; and it is further

**ORDERED** that Defendant's motion to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and strike certain of the Complaint's allegations pursuant to Fed. R. Civ. P. 12(f) (Dkt. No. 15) is **GRANTED** as to Defendant's request for dismissal of Plaintiff's claims for breach of the implied covenant of good faith and fair dealing (Second Cause of Action), unjust enrichment/restitution (Third Cause of Action), and money had and received (Fourth Cause of Action), and is **DENIED** in all other respects; and it is further

**ORDERED** that Plaintiff's claims for breach of the implied covenant of good faith and fair dealing (Second Cause of Action), unjust enrichment/restitution (Third Cause of Action), and money had and received (Fourth Cause of Action) are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: March 3, 2021
         Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

motion to strike than the argument about increased discovery costs Defendant raises here. *Coach, Inc. v. Kmart Corp.*, 756 F. Supp. 2d 421, 426-31 (S.D.N.Y. 2010).